Good afternoon, Your Honors. May it please the Court, Stephen Barth with Federal Defender of San Diego, on behalf of Defendant Appellant Jennifer Byrne. I will be reserving a short period of time for rebuttal. In this case, Your Honors, the government violated this Court's precedent that irrelevant, overly prejudicial testimony and closing arguments about unsubstantiated, unnamed drug organizations operating in Mexico and how they operate is not admissible. The government's position is that I opened the door. However, that is an entirely unfair position. It was Agent Moran who testified on direct examination about this unusual handprint that was found on the gas tank of the truck. Was that an unusual handprint or was it a handprint? That's correct. The question was, did you make any other observations of anything unusual? Yes. There is a handprint on that gas tank. This is the same gas tank that had the marijuana in it that was ultimately attached to the car my client was driving when she reached the port of entry. Of course, my client was the only one on trial in front of the jury. So the undeniable inference was that that handprint was my client's. In its brief, the government, on page 15, says, well, this handprint testimony was actually relevant because it, quote, let the jury know what happened and showed the thoroughness of their investigation. However, they really achieved neither one of those goals. First, they really did not need to elicit the handprint testimony. So didn't the fact that the handprint was there make them more suspicious about the gas tank? That's correct, Your Honor. That's the government's position. They wanted to show what was suspicious about the gas tank. However, as I'm – as I was saying, I believe it was extraneous in the sense they had significant testimony to show the thoroughness of their investigation and why the car was sent to secondary and ultimately searched. There were gas tank straps that looked tampered with, bolts that looked too new. But if it is relevant to the question of whether it was suspicious, they're not precluded from offering relevant testimony because it's got other relevant testimony. That's true, Your Honor. And that moves me to my second point, which is when the government says they wanted to show the jury what happened, they did elicit this handprint testimony, which left the jury with this notion that it was my client's handprint, but they didn't – they said, any other unusual observations? Yes, the handprint on the gas tank. But they asked no follow-up questions of Agent Moran, such as, well, did you preserve those handprints? Did you check to see if they were Ms. Burns? So they left that false notion, sit with the jury, and I was forced to get up and cross-examine on that issue to dispel the notion that they created that that handprint was my client's. Do you think you could have argued in closing argument, if they had just left the testimony as it was, could you have argued to the jury, you may have noticed that they do not contend that that's my client's handprint? I certainly – my fear was that they would argue that it was my client's handprint. How could they do that? Well, there was – they – There's no evidence of it. Well, Your Honor, they could have argued that it was a fair inference from the testimony that there was a handprint on that gas tank. She was the one on trial. She testified she didn't know anything about it. Well, I guess they could have. But you're correct, Your Honor. I certainly could have, in closing argument, argued, well, you didn't hear any testimony from the government agents that they preserved those fingerprints. And I could have argued that they didn't prove that it was Ms. Burns' fingerprints. But I think that would have only been doing half of my job. I mean, it's not nearly as powerful if I haven't actually questioned the agent about it, because those jurors could then reflect, well, why didn't Mr. Barth stand up and ask? I mean, it's true the government agents didn't tell us that they preserved those fingers. It's true they didn't tell us that they compared them to Ms. Burns' fingerprints. But Mr. Barth had an adequate opportunity to question them and get that information out. So my – the answer to your question is yes, I could have argued it, but it just wouldn't have been very powerful because it wouldn't have been supported by any testimony. It was my duty, I believe, to be effective counsel to dispel that false notion for the jury. But as I point out in my briefs, Your Honor, I did this in a very narrowly tailored fashion. The case law with regard to this issue has talked often about how defense attorneys question agents about why they didn't lift fingerprints from the packaging or the other areas of the car. I never did that. All I did was dispel the notion that it was Jennifer Burns' fingerprints and that the government didn't preserve them. In order to dispel that single false notion, there was never any questioning about the packages themselves or any other part of the car why they didn't preserve fingerprints there. Your Honor, as a result of this, we had testimony by Agent Saucedo. One, that there are drug traffickers down in Mexico, that those drug traffickers have crews, that those drug traffickers use these crews to drop the tank, fill them with marijuana, and then load the tank. That was also supported by the testimony of Special Agent Wright, who was used as a value expert, Your Honor. And that value expert talked about how, indeed, there are drug smugglers in Mexico who hire people to cross drugs for them. But I think the real prejudice in this case took place in the closing argument, Your Honor. There are several instances that I've cited in the excerpts of record in my opening and reply brief about, one, these crews. There's repeated mention of the crews that work for drug traffickers in Mexico. Further, the trial counsel, government counsel, took it one step further. Again and again, he referred to kingpins, the boss, the mastermind, and how these crews work for such a kingpin and boss. I cited several instances. My mistake was that I only cited his opening closing argument. There are actually additional references to kingpin in the record, in the reporter's transcript, Volume 3, page 69, where he refers to kingpins again. And in this way, the government was repeatedly connecting my client to drug organizations, unnamed, unsubstantiated drug organizations, that are in Mexico, implying that she had participated in a larger-scale operation that was really before the jury or in the evidence. Your Honor, like I said, I listed many instances where he refers to these crews and how there are folks who are more culpable, more, getting paid more, et cetera. And that moves me to my next argument, which is Ms. Byrne was denied a mitigating role adjustment in this case. I specifically asked for one in my sentencing papers, and I was denied. It's our position, the defense's position, that the district court did not use the correct standard. And I've laid that standard out. It's in United States v. Rojas Mian. The district court needs to look at the defendant's role in comparison to all other likely actors, all other likely actors. Now, when I was before Judge Whalen in this issue, he listed, he said that he didn't believe that Ms. Byrne was an average courier. He listed several things, however, which didn't really support that. He said she claimed to be the bona fide purchaser of a stolen truck. Well, I guess what he was getting at there was that he didn't believe her, that she lied about being a bona fide purchaser. That's more appropriately addressed by an obstruction of justice adjustment, which, indeed, Ms. Byrne received. He also said that the gas tank had been exchanged and somebody had left enough gas tank so as, gas in the gas tank, so as not to alert the narcotics detector dogs. The VIN had been professionally altered, and he says somebody who did this must have known what they were doing. However, these weren't, he was alluding to other people who were doing these acts and not Ms. Byrne, and he never compared Ms. Byrne's role to the roles of those other people who made this scheme possible. Who else could have been involved? What other likely actors were possibly involved? Well, somebody needed to procure that fraudulent contract from the dealership. I elicited testimony from the owner of the dealership that his contracts are behind locked doors and that they have a security system there. And the only way this fraudulent contract could have been made was if it was copied from one, a legitimate contract from his business. That testimony was very clear. Also, the people who loaded the marijuana into the car. This is kind of an interesting issue here because it dovetails on my earlier argument. Again and again, the government referred to these crews and the possible kingpins in Mexico who were running the show, so to speak. She is not on trial for loading the gas tank. She is not on trial for transporting the gas tank. She is not on trial to be the kingpin. Indeed, in his reply or response closing, he says, just because she is a young woman and just because she may be a minor player, it doesn't mean she did not commit this crime. The government's closing argument had one common theme running through it. Although there may be kingpins, although they may use crews, although there may be more culpable parties, and although there may be people getting paid more, even though she may be a minor player, that doesn't mean she isn't guilty. Now, the government essentially wanted its cake and eat it, too. They wanted to use this irrelevant, overly prejudicial testimony about drug operations in Mexico and say how Ms. Byrne was the minor player compared to these organizations, but then they requested that she not be given a minor role. I want to reserve some time for rebuttal. However, I briefly would like to address the Fourth Amendment issue, very briefly. United States v. Arvizu, I think, plainly shows that the methodology that needs to be used when analyzing a Fourth Amendment claim is a totality of the circumstances standard. And I think in this case, it cannot be forgotten that there were, when you look at the totality of the circumstances, you need to look at factors that may warrant innocence or nonsuspicion as well as suspicion. In this case, I list in my briefs several factors that I believe warrant innocence or nonsuspicion, such as the negative alert from the narcotics detector dog, that there were no signs of nervousness, and that Ms. Byrne was cooperative when she was answering questions. I'm going to reserve the balance of my time for rebuttal. Thank you. Thank you, Keith. May it please the Court. Patrick O'Toole on behalf of the United States. Your Honors, in the interest of time, and it's been a long afternoon for the Court, I'm going to limit most of my comments to the Vallejo issue. I have one question on another issue. Yes, Your Honor. Did the government really say to the jury she may be a minor player? That's – we did, Your Honor. Then they say to the judge she's not a minor player? We said that at RT-677, and the one comment that I wanted to make on that is this. I do not believe that Judge Whalen erred by not giving her a mitigating role adjustment. But I am not opposed to this panel remanding the mitigating role adjustment back to the district court. Judge Whalen may make the very same finding that he did before, but I will assign the case to myself and the government. If we do go back to the district court and remand, we will not oppose a mitigating role adjustment. That doesn't mean I think the judge was wrong. No, no. I understand that. But I do – I am sympathetic to the argument that in closing argument the government said just because she's a minor player does not mean she did not commit the crime of being a courier. I'm glad you're taking this position. I don't think – I'm bound to it, but I am going to do that. If this Court does remand it, I will handle it myself. We'll take that position, and Judge Whalen will make the finding that he makes, and we may be back up before. But I did want to say that on that one issue, and now I think I'm finished with that issue. Yes, you certainly are. Thank you very much. Thank you, Your Honor. The – again, I'm not saying he's wrong or we have to do it, but I'm willing to do it. The Fourth Amendment issue, Your Honor, I think there clearly was reasonable suspicion in this case. I don't even think it's a close – it's a close issue. Beyond that, the issue of gas tank searches is before the Supreme Court. It's going to be argued within the next few weeks. Well, we're just assuming for purposes of this argument that you do need reasonable suspicion. We had it at this page, Your Honor. I don't – We're aware that you may not need it after next week, but as of now, we're just going to proceed on that assumption. That's fine. Your Honor, we had reasonable suspicion at this page. We had the gas tank tap, we had the hose, we had the bolt, and we had the handprint on the gas tank. If that's not reasonable suspicion at the border for a lawfully stopped vehicle, I simply don't know what is. So the major issue we have is the structure issue. And I'm not going to suggest to this panel what the case law holds because one of Your Honors authored the Vallejo opinion, which is one of the most relevant cases on this, and one of Your Honors authored the Pineda-Torres case, which is really relevant to this. But I think factually is what determines whether there was error or not, and I think that's the part of this that's very, very important. The government provided discovery in this case, and the discovery indicated that Inspector Moran said that there were tool marks on the clamps, tool marks on the hose, and that there was a handprint on the gas tank – on the gas tank. So defense counsel knew he had that evidence. And the defense counsel filed an unlimited motion to keep out structure evidence, which is very important. The government files an unlimited response, we list the statement of facts, and we list again part of the facts are that there was something on the gas tank hose, there was something on the gas tank clamp, and you have this fingerprint, handprint on the gas tank. So we specify that fact in our statement of facts. Defense counsel says this in his motion. The defense will only cross-examine government witnesses regarding the lack of fingerprints if the government is allowed to present drug structure and organization testimony. That's the representation by the defense. We will only get into fingerprints if the government's allowed to introduce structure evidence. What position does the government take in limiting? We agree we're not going to introduce structure evidence. We say that, period. Government does not intend to present expert testimony regarding structure, but reserves the right to do so if the defendant opens the door by raising the issue of lack of fingerprints. What happens at the hearing? The judge, in light of the fact that the government said we don't intend to get into structure evidence, Judge Whalen says unopposed motion to exclude structure evidence is granted, but he specifically cautions the defense against opening the door like the defense counsel did the exact previous week regarding fingerprints. Defense counsel says if the government thinks that we open the door, we want a sidebar before you just launch into it. So what happens after that? Opening statement, really none of this comes up. The government puts on Inspector Moran. We had filed the statement of facts for our trial memo. Our statement of facts in the trial memo elicited the fact that we were going to elicit the handprint on the gas tank. Defense counsel never objected to this testimony during the examination, never brought a motion in limiting to keep it out, never asked for it to be struck, never asked to approach sidebar to say, Your Honor, the government has now opened the door to something that we need to do now. None of that happened. No objection, no motion to strike, no trying to keep that evidence out, and he knew we were going to be going into that evidence because he had it in discovery and we listed it in our trial memorandum. So what happens? The government innocuously sold. The inspector testifies about the gas tank, trying to explain why the gas tank was searched so that the jury doesn't think that the government willy-nilly or arbitrarily is just dropping gas tanks. Well, the gas tank filter looked unusual. It had marks on it. The gas tank strap bolts looked unusual. It had marks on it. There was a handprint on the gas tank corner. None of this was readily observant. The government moves on. Again, no objection, no motion to strike. On cross-examination, now, defense counsel stood up and said that he had to get into this and he barely got into it. Of this particular witness, he asked seven different questions regarding fingerprints or handprints. I counted them. It's Government S.E.R. 36 to 37. Whose fingerprints are on it? No idea. You don't know because you didn't check. You didn't have the fingerprints dusted. Your job was to determine what happened. He's attacking the thoroughness of the investigation. We come back on redirect. We still don't get into it. Now we have another agent who testifies, Agent Salcido. He takes Agent Salcido as his witness. He asked ten different questions. I mean, I counted them last night. Ten different questions regarding fingerprints, including you didn't preserve or lift the You did not try to determine whose they were. We don't know whose they were. You had training in how to move fingerprints. We get to sidebar, which is exactly what he asked for before. We're at sidebar. Government counsel says, counsel has asked questions about prints. Court, he opened the door. Government counsel says, I wanted to make sure. We did exactly what we should have done. The court warned defense counsel not to go into it. We asked for a sidebar before we come back into it. And how do we come back into it? There were 17 questions asked about fingerprints. We simply asked this on redirect examination. We established that we didn't check for prints because by the time the agent got to the gas tank, not only the original print was there, but it had been handled by government inspectors and it had been handled by the mechanic. There's prints all over it. You don't know whose they are. So he says two things. One, we didn't check for prints because it was handled. Two, Byrne probably didn't load it. No one thinks she loaded it. That's not how these cases work. So that's good for the defense. Byrne probably didn't load it. A crew in Mexico did. We wouldn't expect that we'd find anything of evidentiary value if we checked the prints. This case is exactly like the Alatorre case where this Court said that this evidence is relevant where the door is open. But those are the only three questions that we asked. And it was made relevant. It was made proper rebuttal because of what the defense did in this case. Now, it's clear that the defense was confused when they were at sidebar. But the district court wasn't confused, and that's not our problem. District court judge three different times said that they opened the door for it. And, again, we didn't introduce full-fledged structure evidence about marijuana is grown in South America and it's shipped on a boat to Mexico, and all the things that happened in Mexico, which was the problem in Vallejo. I mean, it was top-to-bottom structure evidence. All we did in this case was basically establish the common-sense proposition that it's not surprising that her handprint isn't found in that gas tank because that's probably not what she did. And that was exactly consistent with what the defense did or the defense theory was. In this case, they said in closing argument that that handprint was the most important piece of evidence and the happiest day in the world for the true trafficker was when the government got rid of the handprint because they wouldn't know whose it was. Nobody was thinking that that burned it. The defense in this case was that this single mother, child of four, goes down to Ensenada to spend some time with her friend Naomi and some bad people. It may have been Wade Weston. It may have been Jose. It may have been somebody else. But these other bad people manufactured a key, somehow got a key, and switched gas tanks. I mean, that was the defense. But either way, it was nothing that burns it. And the only issue in this case, both sides really agreed with that. Her handprint's not on the gas tank. She had nothing to do with loading the gas tank. She had nothing to do with switching the gas tank. The only question was, was she knowingly involved in this case? And nothing that the government did relative to showing that our estimation, that we weren't sloppy, we weren't negligent in not checking the fingerprints, nothing went to the knowledge. So there was no harm in it. It was consistent with the defense case. It was invited by the defense. There was a specific ruling by the court. And the district court judge, who was in the best position to know, he did not rule that the government opened the door to any of this. He specifically ruled that the defense opened the door to it. And that's why this case is different than Pineda-Torres, where the government indicated it was going to go into this. The government sent a letter that we were going to try to introduce this kind of testimony. The judge tells the defense, please plan accordingly. And then the defense attorney does, so he tries to remove the sting by getting into it. And then on appeal, the government takes the position that the defense opened the door. Well, that wasn't fair. I mean, that was disingenuous. We shouldn't have done that, because the defense was doing something in light of the district court's ruling that said the government could do it. But our case is just like Alitore. Alitore, the district court judge, Judge Keefe, said, no, you don't get to get into this unless they open the door. Here, Judge Whalen says, no, government, you don't get to get into this. And we didn't want to. We said we wouldn't unless the defense opens the door. They opened the door. They're probably sorry they did it now. Frankly, I don't think it would have made a difference one way or the other. I think the jury was going to convict anyways. But a mistake was made. But there was no error. This isn't a case of harmless error. There was no error at all. Consistent with this Court's cases in Vallejo, Pineda-Torres, Alitore, the government did exactly what it should have done. It was authorized to do so once that door was opened. And beyond that, I'll answer any other questions that the Court has. Thank you, counsel. Thank you very much. Government mentioned that there was an attorney who brought in, invited structure the previous week. I just want to make it clear that that attorney was not me. This is not a modus operandi of Steve Barth. The government did provide discovery, as they do in all cases. And I'm sure Mr. O'Toole is correct that in the discovery there was mention of the handprint. Indeed, the handprint, I knew about the handprint because they turned over a photo of it to me, and they talked about it in the hearing on reasonable suspicion. However, I did move in limine to keep structure evidence out. The judge ruled that structure evidence would not come in. And the government counsel, as well as me, knew the law in this circuit. That is, once there are fingerprint evidence issues out there and you cross-examine on it, then structure evidence comes in. So they were forewarned ahead of time that getting into this fingerprint evidence was really against this circuit's precedent. And I didn't think, I don't think I even considered in liming out the handprint. I didn't even, I mean, I was concerned with structure evidence really is what it comes down to. Isn't a handprint conceptually different than a fingerprint and the whole scientific process of fingerprinting for purposes of identity? I'm just saying that there was a handprint there. It's not really identifying any person. It isn't even, it doesn't really connote identity as opposed to just somebody who had worked on the gas tank. Well, again, Your Honor, I don't know. I think you, I don't know if you can identify somebody from a handprint versus a fingerprint. But if, when you say handprint, I mean, you're talking about the entire hand, the fingers, et cetera. My concern at the time they brought out the, that there was an unusual handprint on that gas tank was that the jury was going to come to the conclusion that it was my client. And really, I don't know what other conclusion they would come to because the government was saying that my client was responsible for the marijuana that was being brought into the United States. So I really believe that that notion was there in front of the jury. And without dispelling that notion, I would have been left doing my client a disservice. Now, the government in its brief mentions, in line with the argument you just heard, that, you know, I didn't object at the time it came out. The question itself really wasn't objectionable. I don't think it was objectionable. And the government's position is still that the answer itself was relevant to show the thoroughness of their investigation and what had happened. They wanted to show the jury. However, once the answer was out there, jumping up and objecting, Your Honor, I don't think that would have done a service to my client either. I think the bell had been rung, so to speak, and me objecting at that point wouldn't have unrung it. I think it would have actually amplified it. But you knew they were going to introduce that evidence. Excuse me? You knew they were going to introduce the evidence. Introduce the handprint evidence? Yes. I did not know that, Your Honor. I mean, what Mr. O'Toole says is most likely true. I don't remember what was in the government's trial memorandum, but I do remember they gave me a picture of the gas tank with the handprint. But I didn't know that they were going to elicit testimony at trial about the handprint. Perhaps an oversight on my part, but I thought we all knew that if structure evidence was deemed inadmissible, we wouldn't be getting into handprints. And I inlimbed structure evidence out of this case for that very reason. I was very concerned about it, for obvious reasons. The testimony is very, very prejudicial. I don't think you have to be too concerned. I think the client was going to be convicted anyway, as the government said. Well, Your Honor. This doesn't seem to be, you know, you may – maybe you were not aware they were going to do it, and it's not – I mean, it shouldn't have been a great surprise. But if it was, given this – all the facts in this case, I don't think – Well, Your Honor, to the extent – It's terribly important. To the extent that Your Honor is saying that you believe that the error was harmless, I respectfully would have to disagree. I believe the nature of the evidence that came in is such that it's almost per se harmful. In the United States v. McGowan, this Court said in one of the last sentences of that opinion, because of the circumstances here and because of the – what was admitted at trial, reversal is required. We had the testimony of Saucedo, the repeated references to Cruz and Kingpin south of the border. And what we had here was a woman, a 24-year-old woman with no prior convictions. She got up on the stand and testified in her own defense, which you did not have in Pineda-Torres. In Pineda-Torres, for instance, you had testimony that the defendant was nervous, that she wasn't – he wasn't making eye contact. And they put on no evidence whatsoever in defense other than trying to create reasonable doubt. And that case was reversed. I think, indeed, in this case, the references to Kingpins and Masterminds is different than Vallejo, McGowan, and Pineda, which just talk about the compartmentalization of drug organizations in Mexico as opposed to the ominous figures that run them. So I do think that the error in this case – and it is a harmless error standard. I did object timely. It is the government's burden to show that this was, indeed, a harmless error. I don't think you have that in this case, especially in context of McGowan, Vallejo, and Pineda-Torres. Thank you, counsel. Thank you both very much. The case just argued will be submitted. The Court will stand in recess for the day. Otherwise, the hearing is adjourned.
judges: Reinhardt, Thompson, Wardlaw